## THE EUXINIA.

### WARD v. DAMPSKIBSSELSKABET KJOEBENHAVN.

(Circuit Court of Appeals, Third Circuit. January 30, 1907.)

#### No. 15.

SHIPPING—LIABILITY FOR DEATH OF QUARANTINE OFFICER—FALLING THROUGH OPEN HATCHWAY.

A port quarantine physician, who in the course of his duty went on board an incoming steamship at night while she was coaling, fell through the open coal hatchway and was killed. He had passed the hatchway in going with the master to the cabin, and was warned to be careful, and when he came out a short time after he was again cautioned by the master to look out for the hatchway, and also by a friend who was walking with him and had hold of his arm; but as they were passing the hatchway, walking over the covers which lay in the gangway three feet wide by its side, he in some way stepped or fell over the edge. The evidence tended to show that it was sufficiently light to enable one who knew the position of the hatchway to pass it in safety. Deceased had been a boarding officer for a number of years, and had been on the same ship a number of times. Held, that no negligence could be attributed to the ship's officers which would render the owners liable for his death.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 346.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinions below, see 136 Fed. 502; 144 Fed. 524.

J. Parker Kirlin and Henry R. Edmunds, for appellant

Frank R. Savidge and Alfred Driver, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from a final decree of the court below, awarding $25,654.40 to the libelant, in a cause civil and maritime. The libel was filed by the widow of the quarantine physician against the owner of the steamship "Euxinia," to recover damages for the death of the libelant's husband, resulting from a fall through a coal bunker hatch on said steamship, on January 21, 1903. The accident occurred about 7 o'clock in the evening, when the vessel was in the Delaware river, near the quarantine station.

The facts of the case, as disclosed in the record, are as follows: The steamship "Euxinia," owing to a stormy passage from Rotterdam, was short of coal on entering the capes of the Delaware, and the master telegraphed from the Delaware Breakwater to have coal sent to him, to enable him to reach port. The tugs "New Castle" and "Juno" were accordingly sent down the river, and met the vessel just before she arrived off Reedy Island. The steamer encountered some ice shortly after passing this point, but after she got clear, the tugs came alongside, the "New Castle" on the port side, and the "Juno" on the starboard side, and both tugs began to load coal into the steamer. The "Euxinia" was a steel and iron vessel, of 3,650 tons register, 348 feet long and 48 feet beam. A raised deck, 107 feet long, occupied the middle portion of the ship, with deck houses, consisting of a captain's

cabin and dining room, steward's and other rooms, with chart house and pilot house in the forward end, while there were officers' rooms and steering gear at the other end, leaving a deck space between the structures on each end, of 50 feet, through the middle of which came the smokestack. A clear passageway, about 3 feet wide, extended from each end alongside and between the deck houses and the rail. About midway of the open space between the deck houses, on each side of the smokestack, was a hatch for receiving coal into the bunkers. These hatches were about 6 feet lengthwise of the ship and about 3 feet across. The side of the hatch nearest the port side of the ship was about on a line with the port side of the deck houses, so that the passageway between the hatch and the rail on the port side of the ship was about the same width as that between the deck houses and the said rail. The starboard hatch was correspondingly placed. From the near side of the hatch to the covering over the boiler hatch, was about 5 feet. On the night in question, about 7 o'clock in the evening, Dr. Ward, the decedent, approached the steamer as she was slowly passing the quarantine station, on his boarding tug, for the purpose of making an official inspection. Owing to the fact that one of the coaling tugs, the "New Castle," was fastened alongside the midship section, his own tug fell astern of her, and the doctor boarded the ship at the after-gangway, just below the raised deck, where he was received by the captain of the ship. As the doctor was expected to board the ship at the forward gangway, the crew, who were mustered around the forward hatch for the doctor's inspection, had to be brought aft by the mate, who was present when the doctor came on board. After the inspection, the captain testifies that the doctor made signs that he wanted to go to the cabin to perform his office business. The cabin, it will be recollected, was on the forward end of the raised deck. Accordingly, the captain and the doctor mounted to this deck and walked together along the passage way, between the rail and the after deck house. The mate seems to have followed them. The captain testifies that, as he started to go forward to conduct Dr. Ward to his cabin, he called his attention to the fact that they were coaling, and that the ship was very untidy; that he pointed out the open hatch where the coaling work was going on, and as they approached the same, admonished him to be careful as they walked around the hatch, between it and the central boiler covering. He says that the decedent replied, "That's all right; I see," and that they then proceeded forward; that the opening in the deck was shown to the decedent, and that he "indicated by his answer that he saw it just the same as I did." Men were working at the hatch, taking on coal at the time. The captain testifies that, after they had performed their business in his cabin, a certain Capt. Bellevue came in, who was an old acquaintance of the decedent, and they greeted each other and talked about some private matters, being members of the same club. Capt. Bellevue was marine superintendent for the Red Star tugs, and had charge of the coaling of the ship, being then on board for that purpose. From the testimony, he must have been as well informed as to the decks of the steamer, especially as to conditions on the raised deck around the open coal

bunker hatch, as were the captain or officers. Capt. Neergaard testifies as follows:

"Then the doctor said good-bye to me, and turned around to go, and I said, 'Well, I will follow you,' and I took my papers and collected my papers and put them inside the table, and followed closely Capt. Bellevue and the doctor who had left the cabin before me, and I came up to them just in the moment when they were going out from the passage to the deck. Coming out there, they proceeded aft to go towards the tug, and just when we came outside of there, the men were about dragging one of the ash buckets filled with coal across the deck, and in that way obstructing our passage, and seeing that then all three of us stopped until a clear passage came, and the doctor and Capt. Bellevue were to the right of me, and, therefore, the coal coming from the outside part of the vessel, the doctor and Capt. Bellevue got a clear passage before I did. Therefore, in the moment they got a clear passage they proceeded aft, while I had to stop a moment until the people had passed me. Therefore, they took the way to the right along that rail, while my way fell more naturally right ahead, after I was obstructed no more. Q. Do you mean they went alongside the rail? A. They went alongside the rail. Q. Which rail? A. The port rail. Q. And you went where? A. I went on the other side of the hatch, between the hatch and the engine-house, just opposite Dr. Ward and Capt. Bellevue. Q. At that time, after you came out of the cabin, did you have any conversation with the doctor? A. I had, because the moment when they commenced to go from the place where they stopped, I said, 'Now, please. Doctor, mind the hatches,' and the doctor said, 'That's all right; I know,' and he proceeded, and I proceeded just abreast of them on the other side of the hatch."

He says that Capt. Bellevue was on the right hand of the doctor and a little behind him, holding him by the arm. The hatch coverings had been placed between the rail and the coaming of the hatch, about filling that space. Capt. Bellevue stepped up upon these hatch coverings and walked along them the length of the open hatch. The captain further testifies that, as he passed along the opposite side of the hatch, he heard Capt. Bellevue speak to the doctor about minding the hatch, and that the doctor replied, "It's all right." The testimony proceeds as follows:

"Q. Will you state just what happened immediately before and at the time of the accident; what you saw? A. I went just opposite on the other side of the hatch, just opposite the doctor and Capt. Bellevue, and watched every step they made, and I saw the doctor, just shortly before he came to the aft end of the hatch, lifting his foot— Q. Which foot? A. It was the left foot— lifting it higher than when a person promenades in the natural way, and in that moment, I thing it was in that moment, I heard Capt. Bellevue say to the doctor, 'Mind,' and in the very same moment I shouted over, 'Doctor, mind the hatch.' He made a step as if he was lifting his foot to cross over the corner of the hatch, and in the very same moment he put his left foot just in the very after end of the hatch, so near that I think the nose of his boot must almost have touched the after end of the hatch coaming, and without a noise and without a word any more the doctor disappeared."

The first mate, who was present when the captain came on board and inspected the men, followed the captain as he conducted the doctor towards his cabin on the raised deck. He says that he went forward and up on the bridge, which is situated over the forward deck houses. He says he remembers the captain and the decedent coming out of the cabin, and heard Capt. Neergaard say to the decedent, "Look out for the hatches," and that the decedent answered, "Oh, that is all right."

Capt. Bellevue and the decedent came out of the cabin together, Capt. Neergaard following closely. Capt. Bellevue testifies as follows:

"After we came out of the cabin, I got hold of the doctor's right arm with my left hand, and I think there were some gratings on the deck along between the house and the bulwark, and I said to the doctor, 'Doc., be careful.' He said 'That is all right,' and we walked along until we came to where the companionway is, where they were taking coal in. Capt. Neergaard was just a little ahead of us to the left, and he happened to get past before they brought this tub, and I kind of held the doctor until they got the tub past. Then instead of our going the same way that the captain did, we pulled out to the right along the rail, and we were between the rail and the bunker hatch, because they had this tub and were just about to dump it there. I thought that we would gain time, and it was perfectly safe, and we took the other passage. After we got up onto the hatches, there were three or four hatches lying between the hatch coaming and the rail. They were lying crosswise. We stepped up on them, and when we got to the last section of the hatch I said to the doctor, 'Doc, be careful of the hatch.' He turned his head around just this way (indicating). Q. In which direction? A. To the right. He said, 'That is all right, Cap.' Then he lifted his left foot, not to step ahead, as though he was going to make a side step, and he stepped in the forward section of the hatch, and when he fell I had my glove on and could not hold him."

There is some conflict in the testimony, as to how far there was sufficient light in the neighborhood of the open hatch. The witnesses from the tug on which the decedent came on board, speak of it as a dark and misty night. The officers of the ship, however, and of the coaling tugs, speak of it as a clear night, and that while there was a little mist on the surface of the water, they could see lights ahead for two or three miles, and that one standing on the bridge could see objects from one end of the ship to the other. It is also in testimony that lights placed outside of and near the hatchway had been discarded by Capt. Bellevue, as they served only to confuse the sight of those who were at work, and that the men worked better without them, as the light from the engineer's room and the two masthead lights of the tug "New Castle" alongside, which were not many feet above the raised deck, served in some degree to illuminate that portion of the deck. There was also light from the steward's quarters at the forward part of the bridge deck.

We think the preponderance of testimony on this point is, that it was sufficiently light in the space around the open hatch, not only to conduct the operation of coaling, but to make it safe for those who were aware of the position of the hatch, in passing along the raised deck. We think there is no doubt upon this testimony, that the decedent was sufficiently informed as to the position of this open hatch, and the danger to be avoided, to have put him upon his guard in relation thereto. He had been for several years a boarding officer, was familiar with the general arrangement and construction of ships' decks, and had been on board this particular steamer some 24 times, in performing his official duties. We cannot find that negligence should be attributed to the ship's officers in the matter of this unfortunate accident. It may be quite true, as testified by Capt. Sargent and Capt. Randall, on behalf of the libelant, that it was the custom on passenger ships to put a barrier around an open hatch, or prevent unauthorized persons from walking on that part of the deck. In such cases, it would be impossible to personally con-

duct each passenger or unauthorized person around the point of danger, and only by barriers as would prevent all such persons from approaching it, could the requisite protection be given. We agree that the absence of such precautions might render liable, in case of injury to a passenger, the ship and its officers who had omitted them. But no such case is presented here. Although the decedent was familiar with ships generally, and this ship in particular, he was not sent forward along the raised deck to the captain's cabin alone and unguarded, even though he had been told that the ship was coaling. He was conducted by the captain himself, and the open hatch pointed out to him, and the evidence is uncontradicted, that the decedent saw and noticed the open hatch and the coaling operation to which his attention had been called. It is not, of course, suggested that there was negligence in the mere taking the decedent across the raised deck, to and from the captain's cabin, however guarded such taking may have been. With the general understanding which the decedent already had, of the position of the open hatch, it was again particularly called to his attention by the captain, as he started aft on his return. Moreover, the party of three were stopped within a short distance of the hatch by one of the coal buckets on the deck, which was being moved towards it. This must have served in an especial manner to have directed the attention of the decedent to the open hatch, where the coal was being dumped. The party then divided, the captain going on one side and Capt. Bellevue and the decedent on the other, as explained by the testimony of Capt. Neergaard. There was room enough to pass between the rail and the hatch, the passageway being of the same width as that which traversed the distance between the rail and the deck houses. Nor, it is to be observed, was the decedent left to pursue his way alone on that side of the hatch, while the captain was on the other. The captain saw and knew that the decedent was in charge of a man as experienced and as well informed of the situation as himself, and no negligence can be imputed from the mere fact of his being so left to the care of Capt. Bellevue, nor is any negligence even suggested as having been committed by Capt. Bellevue himself. We think on the whole case, that the accident was one of those inevitable ones for which no one is responsible. Unless there was a want of due care in allowing the decedent to go at all with the captain to the cabin and from the cabin back to the gangway, there was no want of the most abundant care and caution on the part of those that conducted him, and it is not necessary to inquire whether or not he was himself sufficiently prudent.

Giving due weight to all the findings of fact made by the learned judge of the court below, we cannot from them infer negligence on the part of the respondent. The decree of the court below is therefore reversed.